on behalf of Mr. Manuelito. I'm going to attempt to reserve three minutes for rebuttal, but I'll keep my time. Your Honors, the 8034 hearsay exception for statements made for medical treatment. This Court in Cootes-Watawa and other cases has explained that what underlies this hearsay exception is the incentive to be truthful when seeking medical treatment. And so what's determinative is the declarant's view of the purpose in making the statement. And here, S.A.'s purpose in making the statements at the ER was to document her injuries and preserve evidence for law enforcement. But that was not her only purpose. The medical professionals testified, and it seems to me that the testimony falls pretty much within the case of U.S. v. Latu, where the medical professionals talked about why they wanted this information. And in fact, it was used in this case to decide on what tests to do and what kind of treatment, mental health or physical, was required. So isn't it still permissible, even if there's a dual purpose, so long as one of the purposes is actually to receive accurate medical diagnosis and treatment? Well, I have two responses, Your Honor. First is the government has relied on Lukashov and on the MEMDISPO and NES to argue that there is a dual purpose analysis to apply. And if you look at Lukashov and if you look at NES, there was no dual purpose analysis there. Well, that is actually not entirely my question, because we do have cases that say that context can be determined not just from one piece of evidence, but also in particular from what the medical profession went through physical testing as a result of all of this. It was not just I'm here to blame someone. Well, again, two responses, Your Honor. I think part of that physical testing was to document injury. She got the CT scan to see, for instance, if she had bleeding or swelling on her brain to document whether there was a concussion. But to Your Honor's first point, this Court has said that the medical professionals' view of the encounter is informative. But what it stressed, and Kuzwatov stressed it twice, is you look at that context and you make an inference from that, as long as there isn't any evidence in the record that negates that inference that it was for a medical purpose. So let me ask you this. Doesn't the fact that S.A. testified to the same information that was in the medical records and was cross-examined about the credibility of those statements suggest that any error in admitting them was harmless? No, Your Honor. So the entire defense hinged on attacking her credibility. And so Mr. Kuzwatov made discrepancies in S.A.'s timeline of the events. Her mother said she showed up on Monday. S.A. said she wasn't there on Monday. Her mother pointed out that when she came on Monday to get clothes for the kids, she saw bruises on S.A.'s face already. But S.A. said the assault happened Monday afternoon, Monday evening. He pointed out that she could have sustained these injuries other ways, by jumping into a fight, et cetera. And so the fact that she and keep in mind that the assault, the three assault charges were only for the strangulation. And so when these, when this evidence comes in, the testimony from the nurse and the doctor and the medical record, and it says right on there multiple times, she says that she was strangled on Monday and this assault occurred on Monday, that bolstered her credibility. The only real evidence of the strangulation, and again, one of the assault charges was specifically for strangulation, the evidence was because there wasn't really physical evidence of strangulation. So one of the doctors said, or I'm sorry, the doctor said the blood vessels were consistent with, but it was also consistent with blunt force trauma. So her testimony was really what supported that strangulation charge. And when she is test, when she is making those statements to the nurse and the doctor, and then they're essentially relying on those statements, repeating them in court, the exhibit comes in, that bolsters her credibility, which was the entire defense was on attacking that. I want to point the court to the numerous instances in the record, because we were talking a little bit about the dual purpose. And so in Coots-Watawa, again, the court says if there's no evidence otherwise, then you can rely on the medical provider's view of this. Sotomayor There certainly are cases in other circuits and in various states recognizing a dual purpose, that it doesn't destroy the admissibility of evidence of this kind. And I agree with you that our circuit hasn't weighed in on that. But I'm aware of very few cases going the other way. So should our court adopt the view that is prevalent elsewhere and say that a dual purpose is still one purpose, being for medical treatment and diagnosis? No, Your Honor. I don't think the court should. I think it should look at the declarant's view of the purpose in making those statements. Sotomayor Right. And if the person has two ideas in mind, and one of them is medical treatment, why doesn't that suffice? I guess that's what I'm getting at. Well, I don't think this is the case to reach out and make that ruling, because here the evidence is clear that that was not even part of her purpose. She didn't go to the emergency room Monday, Tuesday, Wednesday, Thursday, even though she had a number of family members at her house. The law enforcement officers offered her an ambulance. She didn't go. She went, as she testified on cross and as Exhibit 22 says, she went when the FBI requested her to go for documentation. And then while she's there, she has Dr. Young asking her to sign a release, and S.A. did sign a release to release the records to the FBI. That's at 5ER 848. Dr. Young asked her to sign a release, and S.A. did sign a release. Dr. Young is noting that she gives copies of everything, all of her test results, which were for documentation and to preserve evidence of the injuries that were going to disappear. She gives copies of those to S.A. for the prosecutor and the court hearing. And so when S.A. is there, all of this is informing her view of why she's there. She's there to get documentation of her injuries. And the forensic nurse, I think, backs all that up. Unlike a normal ER visit, the forensic nurse is measuring and photographing all of her bruises, all of her scrapes, and she  I would also say that knowing the identity of the perpetrator is important for both figuring out if the patient is going to be safe and also for mental health treatment, correct? So, I mean, there's a reason why medical professionals want to know who did whatever they did to you. And we're not quibbling with that particular piece of information. I think that if this court finds that S.A. statements were made for medical treatment, it's that all of these statements made at the ER were made to document her injuries. And you think the fact that she got pain medication and was told to follow up, it didn't mean that she wanted the pain medication? She just went there for only one purpose? I believe so. Again, we have to look at what happened while she was there. The nurse and the doctor are telling her, we're giving you a date. It notes the prosecutor. It notes her next court date. It notes the arresting officer. All of this is with an eye towards future prosecution. And she knows that. Because, in fact, she went there to document her injuries at law enforcement's request. And that's what nurse Lennox testified to, is that I used my training to document, she said, so that someone could tell in the future, like in a trial, what the injuries looked like that day. So this is evidence preservation. And she's, S.A. is aware of that. If she had gone on her own on day one, what would have been different about these notes? Because, presumably, if she had said, this person beat me up and caused all these injuries, wouldn't have the results of the discussions with the medical professionals have been the same? I think we would have a very different case, Your Honor. I think, combined with waiting until the FBI asks her to go for documentation, is a major part of this. I think all of the indications in the ER records, I mean, it's right at the top, right after they triage her, this is the first reason they give, is why she's there. She's there to come into the FBI for documentation. So when they're talking to her, the medical professionals know that. They know that they're supposed to be documenting her injuries. And she knows that she's there to get her injuries documented, as well, and to preserve them. So I think it would be a different case if she had gone the first day on her own. I want to turn to the, unless Your Honors have further questions on the hearsay exception. I want to turn to the supervised release condition that barred Mr. Manuelito from contacting his daughter. I have a question about that, as well. The Court clearly did not follow the procedures set out in Wolfchild. But I wonder whether that is because your client affirmatively waived that argument before sentencing occurred. I mean, at some point he said essentially, I don't have custody, but I have some parental rights. And then he said, I relinquish my parental rights, and essentially said, I hope someday in the future that, you know, we can reconnect. But given that, didn't he waive this issue? And therefore, the Court didn't need to address it in the manner that Wolfchild prescribes? I disagree, Your Honor. I think given the stringent protections that are in Wolfchild, the District Court had a duty to clarify, as part of its individualized review of that particular relationship, a duty to clarify what Mr. Manuelito said. Even the prosecutor expressed confusion because it didn't line up with the record. Essay had testified at trial that the whole reason she and Mr. Manuelito met in 2017 was because he had been released from prison and he wanted to work on his relationship with his daughter and get reacquainted. And he had been. He had been staying with them. He went to her recital or a concert a few days before this incident. He says in the panel that... Yes, but none of that takes away from what he actually said in court, which is very clearly, I relinquish my parental rights. That seems sort of crystal clear. And, indeed, the prosecutor was surprised, but there was no indication that he was so backtracking when the prosecutor asked for clarification. I think with respect to Mr. Manuelito, I think he's not well-educated. I think he used the incorrect word. I think he was trying to say, I do not relinquish my parental rights. Again, he... I'll tell you that I have more of a question than my colleague Judge Graber about the clarity of the statement. And so I want to ask you about Wolfchild, which we held that the defendant had a substantial liberty interest in his relationship with his child. Is this a per se rule? For a parent-child relationship? Yes. I believe it is, Your Honor. Wolfchild, I know the government has brought up that this wasn't a close relationship that Mr. Manuelito had. But there's nothing in Wolfchild that gets into the fact that the type of relationship is what gives you this due process right. And, in fact, in Nopaloo, there's the same procedural requirements that are there. And this Court said, we don't even know the type of relationship. It was an intimate life partner relationship. They said, we don't know if this is a damaging relationship, like the district court claims, or a supportive relationship, like the district court engaged in any of that discussion, either prior to offering Mr. Manuelito the opportunity to make his statement, or after when the court imposed the condition? No. There was no mention of his... Other than imposing the condition and referencing this restraining order, there was no reference about his relationship with his daughter. And did the government in this case ever claim that the statement that was made by Mr. Manuelito constituted a waiver? No, Your Honor. They did not. Again, in the... In fact, they're arguing that it's a forfeiture and that plain error review should apply, right? Correct. Nor did they make any comment about that in the district court. The prosecutor asked to clarify it. And I think that makes sense. In the PSR at PSR 20, Mr. Manuelito had told the probation officer that his release plan was to get back into the community and work to support his daughter. Did he have counsel present at the time? He did, Your Honor. And does that counsel have any obligation to ensure that his client is making correct statements? Does he have to say, hey, wait a second, I'm not sure we understand that. I don't know that it affects this argument, given the district court's affirmative duty to inquire about the relationship. Was there anything stated by his counsel? No, that just wasn't responded to. I think part of the problem was Mr. Manuelito had a different attorney for the revocation. And if you look at the sentencing transcript at the end, the district court asked whether they're going to go forward, which violation Mr. Manuelito has admitted to because there were a number on the revocation. At the end of the day, what you're saying is that there was no objection made either by Mr. Manuelito or his counsel who represented him. And that sort of goes to, and I think there's agreement here, that the standard of review for us on appeal is a plain error standard. Is that right?  Thank you, Your Honor. Yes, you wanted to reserve three minutes. You're under a minute now. We'll put two minutes on the clock for you. Thank you very much. May it please the Court, my name is Monica Clapper and I represent the United States in this appeal. Given the prior discussion, I'll start with the hearsay issue. And then move on to the Wolfchild issue, unless the Court would like me to do that in reverse. Starting with the hearsay issue, then, there are a couple of things I want to emphasize. One is what is really in the record factually, and just as important, what is not in the record factually about the underpinnings of this issue. And then the second is the context within which this issue is presented. Factually, the victim in this case, S.A., never said that she only went to the ER to have her injuries documented. She never said that she only went to the ER because the FBI requested her to. She never said that she did not have a choice in whether she went to the ER or not. She never said that she did not believe that she needed medical intervention. And she never said that she would not have otherwise gotten that medical intervention at some point. There were a sum total of six questions asked to her during her period of testimony over two days. The prosecutor asked her on direct, so did you seek medical attention on that day, that day being Wednesday? And she said no. On cross-examination, I want to make sure I get these right. On cross-examination, the defense counsel asked three questions. You didn't go to the ER that day? No. You went two days later? Yes. You went because the FBI requested? Yes. On redirect, the United States elicited that she did not go right away because she was afraid, she was ashamed, she was embarrassed. She testified that it was hard for her to show her face in public because she was beaten. That's all of the evidence that comes from S.A. on this issue. The defense attorney, the defense was in the unique position to elicit more of the evidence that I think they now wish was in the record, if that evidence existed. The government noticed, if the court is okay with this, can I grab my water? Thank you. The government noticed that it would seek to admit this evidence under 803-4 almost a year before trial. And of course it provided the medical records within which the statements were contained. The defense never raised the issue until just moments before the first medical evidence was submitted. So when the very first witness was testifying, that being S.A., there had been no objection noticed about these statements. And certainly the government had no opportunity to elicit more evidence from her on those. And the defense themselves did not either. And secondly, the context of this evidence at the trial is important as well for a couple of reasons. First, the evidence that came out through the medical professionals was moderated. And by that I mean the statements were made by the, testified to by the medical professionals briefly. They weren't parsed out word by word. They weren't unduly emphasized. They were just part of a very tight examination of both medical witnesses. Dr. Young being the first one, she testified to two brief statements in which S.A. identified Manuelito. And then later towards the end of trial, Nurse Lennox testified to three brief statements that S.A. made that included references to Manuelito. That was it from the medical professionals. That's part of the context. The other is, there was other evidence admitted identifying Manuelito as her abuser. Other evidence of her statements, excuse me, made to others identifying Manuelito as her abuser. For instance, she made a statement to housing authority security officers that Manuelito was her abuser. She was running to him from her home, where Manuelito still was in the driveway, and yelling, pointing at Manuelito, saying, he's attacking me, he's trying to kill me. That statement came in. Her statement to another housing authority employee, also her cousin, made on the phone, also referring to Manuelito by name, where it was during the assault. And she said on the phone, he's here, he's here, he's trying to break into my house. That came in, identifying Manuelito. Her statements to the supervisor, housing authority supervisor Crocker, who testified. He testified to exactly what she told him after the assault, the second assault on Wednesday when he broke into her home. He was one of the ones who responded there. And he talked about her statements to him about what happened, how it happened, and who did it. And that was also identifying Manuelito. Then in addition to that, and this sort of goes to some harmless error analysis as well, in addition to kind of the cumulativeness of these out-of-court statements, there were statements from the neighbors who heard Manuelito yelling at her house. At S.A.'s home, and saw Manuelito kicking in the door, went over to her home, and they were the ones actually who flagged down the housing authority security officers, I believe. And they were able to identify Manuelito as the abuser. And in fact, two of the boys, young, I think teenagers, stood in front of Manuelito as he attempted to lunge at S.A. At that very time, there was a video of Manuelito sitting in the driveway next to the door that he ripped off the hinges and the hinges that he ripped off the house. Obviously, he was identified in that video. And there was... I'm going to stop you for a second. I have some questions on, I think, the second issue that you were going to go to, and I'm a little worried that you're going to run out of time. So I want to ask you, if the Wolf-Child standard applies, where in the record does the district court explain why the no-contact condition was necessary to accomplish the goals of sentencing? Okay, I will tell you that. The heightened standard in Wolf-Child doesn't apply in this case because of the nature of the relationship between Manuelito and his daughter. And that there is support in Wolf-Child, and it is cited in the brief, and I can go through it again now, too, but I want to answer your question first. But there is support for the proposition that Wolf-Child only applies when there is the time and the place to do it. And that there is a type of parental relationship with a child that is kind of deserving of that fundamental, extra-fundamental protection. Where in the record does the district court undertake this analysis? Okay, let me get... Sorry, Your Honor. First of all, procedurally, the record does reveal that the district court did comply with Wolf-Child, albeit in various sections. 1ER12, the district court reads the letter from the child, A.A. Okay, so I understand from reading your brief that sort of after the fact, the government has pieced together this puzzle to say this over here, reading the letter, and then at the end, enforcing the no-contact condition, and sort of in between the statement by Mr. Manuelito, all of this together meets the requirement under Wolf-Child. But as I read the record, what we have is a very unclear statement from Mr. Manuelito that kind of is a rambling statement of a number of things, including his desire to rebuild his relationship with his daughter, that he would like to have an opportunity to stay in the facility that he's in so that he can work on resolving his tribal warrants, and then sort of in this kind of very long and unclear and unsophisticated statement that he says he makes a reference to relinquishing parental rights, but then says, in due time, I'm hoping she'll come around. He's devastated by the letter that was read for the first time in court. And it's so unclear, in fact, that the government at trial says addressing the confusion on the government's part, and I'm at ER 46, addressing the confusion on the government's part was when Mr. Manuelito was speaking to the court, I thought I heard him say he intended to rescind his parental rights, but I could have been mistaken. I didn't quite understand it. And then goes on to say, as the court knows, the Wolfchild case does provide that if a person has significant liberty interests in their relationship with their child, then lesser restrictions can be made. And I'll tell you that it's a little bothersome to me that at trial the government is saying, look, I don't really understand what this means. I'd like the court to sort of engage in some analysis here. It ought to apply Wolfchild. And it raises this, and yet in the government's brief to this court, it does an about-face and cites to the statement out of context that Mr. Manuelito made 10 times in its brief and says, oh, it's so clear that Mr. Manuelito was relinquishing his parental rights because he said, I relinquish my parental rights, and quotes that one section out of context 10 times as if the government didn't actually say that there was never any confusion at trial, that the government's own lawyer didn't actually say that they were unclear about what was said. And then later on in the sentencing, the district court with no discussion whatsoever says, you will have no contact in any way with the following victims, including the daughter. So I'd like you to point me to where in the record the district court engages in the very analysis that the government itself indicated needed to happen with respect to the no contact order. And I'm happy to do that. Admittedly, the district court did not take a separate section of the sentencing hearing where he was going through the entire analysis for imposing sentence and say, now we're going to separately consider Wolfchild and this one of 25 supervised release conditions that are being imposed. What the court did is he addressed it along the way. There is nothing in Wolfchild or any of this court's precedents that disallow that. The court did an individualized analysis of the relationship. It did that by reading the letter, referencing the lifetime restraining order that the tribal court had already issued, hearing the statement in context that the defendant made about relinquishing his rights. And I think this court is, pardon me, wrong about its interpretation of the government's response at a later time. Regardless of that, would it have been sufficient? Let's leave aside the statement about relinquishment. It relied on the violent nature of the crime, the lifetime restraining order, and as the judge said, what they've articulated to the court, which I took to be a reference at least in part to the letter. Would those reasons suffice regardless of this other, the relinquishment statement? Yes. And by the way, the court itself did not reference the relinquishment statement. No, it didn't. That's why I'm asking you. It only heard that statement. The violence against the mother, as you cite, Judge Graber, but also that some form of violence was being inflicted on the mother. Well, how do we know any of this when the district court does not actually engage in any discussion on whether or not the no-contact order is more restrictive than necessary to accomplish the goals? We can't know. I mean, it's possible that all of these things, when considered in light of the requirement under Wolfchild, that it does. But that wasn't done here. Because no objection was ever made. So that means, you're right, no objection was made. So the standard for this court is to review this under a plain error standard, correct? Sure. I mean, that's the government's argument, and it's brief, correct? Absolutely. And under the plain error standard, and by the way, I just want to interject for a moment, that there are several instances that the court itself puts in the record at the sentencing hearing where he says, I can't understand you. I just want to make you aware of the fact that you're out of time now, but I would like you to be able to finish your statement. The court says to the defendant, Mr. Manuelito, I can't understand you, you're mumbling. There are three instances in the record at that sentencing hearing at the same time that the government is saying, I couldn't understand it. He brings counsel up and he says that this is unclear, that, you know, is he on medication. So I think you're absolutely right. It is very unclear what he's saying and whether or not he understands the condition and whether or not there is an opportunity to have a less restrictive condition to meet the goals. Correct? And it explains, I was bringing it up to give some context to the prosecutor's argument. I think that's what I heard, but I'm not sure. Does the court want me to go on? I don't have any other questions. I don't either. Okay. Regarding the government's characterization of Wolfchild, it's insufficient for the district court to, at various pieces in the record, just cite to things that perhaps might justify this condition. At 1093 of Wolfchild, the court says, oh, I just lost my point. Sorry, 1092. It says the sentencing court, at the time it imposes the restrictive condition, must itself point to the evidence in the record on which it relies and explain how, on the basis of that evidence, the condition is justified. So it's not sufficient to sort of piece together portions of the record. And it's not sufficient. But the court does say the things at the time it's imposed that I mentioned.  So the only thing I gather that's missing is to say, and for that reason, I am imposing this condition. I mean, the court says here are the building blocks, and so it seems like kind of a, I don't know, it seems to me that it is an explanation of why. I don't see on page 55 where he goes through all of that. I think he mentions the TRO, but he never explains why. Given that the violence was directed at S.A., there's no evidence in the record that Mr. Mammolito had ever been violent towards his own child or other children. But he relies also on the letter from the daughter. Correct. And that's one view of the relationship. He never goes into Mr. Mammolito's view of the relationship. But is it really sufficient to just say, for this reason, I mean, I take the point that I don't think that there's, like, the semantics requirement. It's a substantive requirement, right? Like, he needs to explain why a no-contact provision is necessary to accomplish the sentencing goals and why the condition is no more restrictive than reasonably necessary to accomplish those goals. I mean, it wouldn't have been enough to simply say, and for these reasons, after citing two various things that were introduced at the sentencing, right? Correct, because part of Wolfchild is the district court has to justify, as Your Honor said, the severity and the breadth of this condition and why, for instance, he couldn't have phone contact or e-mail contact with his daughter. That's much less restrictive, but it could still help him preserve the relationship. I want to make one really – can I have 10 seconds? You're out of time, so please make your final statement. Okay. Just the government went through a lot of evidence of other statements about Mr. Manuelito being the attacker. That was all from Wednesday, every single piece of evidence. That's not relevant to the assault charges, all of which had to do with Monday. Thank you, Your Honor. Thank you very much, counsel. This case is submitted.
judges: GRABER, DESAI, ALBA